IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

HENRY REYES CHAVEZ,

         Plaintiff,

v.                                        CV 09-1205 BB/WPL

CITY OF ALBUQUERQUE, et al.,

         Defendants.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

This matter is before me on a motion for summary judgment by Defendants Correctional Medical Services, Inc. ("CMS"), William Shannon, M.D., Patricia Kelly, M.D., and Robert Karp, M.D.[1] (Doc. 118; Doc. 157; Doc. 158.) Chavez alleges that, while incarcerated, Defendants refused to report or document incidents of excessive force or provide him adequate medical care in violation of the Constitution and New Mexico state law. (Doc. 31 at 19-20.) Defendants submitted two *Martinez* reports and jointly moved for summary judgment, arguing that some of Chavez's state law claims are barred by the statute of limitations, he has failed to support his state law claims with an expert opinion, and he has not demonstrated facts that show a constitutional violation.[2] (Doc. 118; Doc. 158.) Having considered the facts and relevant law, I recommend that the Court grant in part and deny in part Defendants' motion for summary judgment.

_____

[1] Chavez named a number of individuals from the City of Albuquerque and County of Bernalillo in his complaint. (Doc. 2 Ex. A.) He later stipulated to the dismissal of all City and County defendants (Doc. 152), and the Court dismissed them with prejudice (Doc. 153). Thus, CMS, Shannon, Kelly, and Karp are the only remaining Defendants in this action, and any references to "Defendants" in this order collectively refer to them.

[2] Defendants have not raised the Prison Litigation Reform Act as a basis for summary judgment, so I will not consider it here.

## FACTS[3]

Chavez is currently an inmate in the Penitentiary of New Mexico South (Doc. 170 Ex. 1 at 9), and he suffers from severe, chronic pain in his upper and lower back, left leg, right shoulder, and wrist, which causes difficulty walking, sitting, and sleeping. (Doc. 31 at 19.) CMS provides medical and psychiatric services to inmates in various state-run correctional facilities in New Mexico, and it provided Chavez with medical care at all times relevant to this lawsuit. (*Id.* at 2; Doc. 170.) Shannon is a physician and Kelly and Karp are psychiatrists employed by CMS, and they treated Chavez while he was incarcerated. (Doc. 31 at 3.) Chavez's legal claims against Defendants may be divided into two groups: those arising out of incidents of excessive force witnessed by Kelly and Karp and those arising out of CMS and Shannon's treatment of his chronic back pain.

## I.       The Alleged Assaults

In the summer of 2006, while incarcerated at the Bernalillo County Metropolitan Detention Center ("BCMDC"), correctional officers assaulted Chavez on two occasions in the presence of Kelly and Karp. (Doc. 31 at 8, 10.) The first assault occurred on July 24, 2006, when Officer Howell allegedly closed the door of Chavez's cell's "food-port" while his hands were still in it, causing injury to his hands and fingers. (*Id.* at 8.) The incident lasted for approximately thirty to forty seconds, during which time Howell used the weight of his body to keep the port door closed while Chavez screamed in pain. (Doc. 170 Ex. 1 at 16; Doc. 170 Ex. A67.) Kelly witnessed the incident but did not intervene, report it, or call for medical attention. (Doc. 31 at 8-9; Doc. 158 at 13-14; Doc. 170 Ex. 1 at 15-17.) Chavez requested that Sergeant Stanley and Lieutenant Baca take pictures of his hands to document his injuries, but they refused to do so. (Doc. 31 at 9; Doc. 170 Ex. A67.)

---

[3] Since Defendants moved for summary judgment, I will construe all facts in the light most favorable to Chavez. *See Ricci v. DeStefano*, 557 U.S. 557,- - -, 129 S. Ct. 2658, 2677 (2009).

The next day, Chavez requested medical attention for his hands. (Doc. 118 Ex. B17.) The treating nurse noted bruising, slight swelling, and abrasions to both hands and a laceration on the right hand. (*Id*.) Since Chavez was currently on 800 mg of ibuprofen per day, the nurse did not prescribe him additional pain medication. (*Id*.) Chavez also filed an inmate grievance regarding the incident, but he later withdrew his grievance on August 8, 2006, when Stanley agreed to take pictures of his hands and collect a written statement from Kelly, neither of which ever happened. (Doc. 158 at 15; Doc. 170 Exs. A67 & A68.)

On August 19, 2006, Chavez wrote Kelly a letter requesting that she report the incident. (Doc. 118. Ex. B19.) In the letter, he reminded Kelly that she was required by BCMDC policy[4] to report and document all abuse of inmates. (*Id.*) He later asked Kelly about her failure to report the assault, and she allegedly told him that she was afraid of retaliation. (Doc. 31 at 9.)

In her affidavit, Kelly admits to witnessing the incident in question, but she disagrees with Chavez's recitation of the facts. (Doc. 158 at 13-14.) She claims that Howell ordered Chavez to remove his hands from the portal, but, when Chavez failed to do so, Howell "inadvertently" closed the door on his hands. (*Id.* at 14.) She did not believe that the incident was "sufficient to rise to the level of having to report it." (*Id*.) She admits to discussing the incident with Chavez at a later date but denies that her decision not to report was based on fear of retaliation. (*Id*.)

---

[4] In his response brief, Chavez cites the BCMDC policy manual extensively, which requires that employees report assaults and ensure that all inmates receive immediate medical attention after a fight or complaining of an injury. (Doc. 170 Ex. 1 at 13-14.) However, despite the fact that I ordered Defendants to provide copies of all "relevant records, policies, or regulations," the *Martinez* reports did not contain copies of any of the BCMDC or CMS policies with regards to witnessing or documenting incidents of force against or injuries to inmates. (Doc. 106 at 2.) Defendants did include an affidavit from Leonel Urdaneta, M.D., a Director at CMS, in their second *Martinez* report that states that there was no internal policy in 2006 or 2007 requiring medical personnel to report such incidents. (Doc. 158 at 16.)

The second assault occurred on August 9, 2006, when Officer Sanchez ordered Chavez out of the shower. (Doc. 31 at 10; Doc. 158 at 32.) Chavez claims he complied with Sanchez's order, but upon returning to his cell, Sanchez punched him in the chest and verbally threatened him. (*Id.*) Karp witnessed the event but failed to intercede, report the incident, or ensure that Chavez received immediate medical attention. (*Id.*) Chavez claims that when he met with Karp later that day, Karp admitted to witnessing the incident but refused to report it. (*Id.*; *see also* Doc. 118 Ex. B16 (Karp's treatment notes from August 9, 2006, acknowledging the incident).)

Sergeant Rosie Garduno conducted an investigation of the incident, interviewed Sanchez, and submitted a report of her findings to Captain Aaron Alberti. (Doc. 158 at 28-29.) According to Garduno's interview with Sanchez, Chavez was noncompliant and refused to leave the shower, so Sanchez had to push him into his cell. (*Id.* at 28.) Garduno interviewed Chavez, and he admitted to defying Sanchez's instructions but justified his behavior on the ground that he had ten more minutes in the shower. (*Id.*) Chavez told Garduno that Sanchez pushed him into his cell, continued to threaten him, and then slammed the door. (*Id.*) According to Garduno, Chavez reported that he was not injured, only mad. (*Id.*) Garduno sent Chavez to medical despite his statement that he was not harmed, and Chavez was subsequently cleared.[5] (*Id.*) Garduno's memorandum is devoid of any mention of Karp. Chavez filed a written statement of the incident on August 9, 2006, at which time he stated that Sanchez punched him. (*Id.* at 23, 33.) This written complaint likewise did not mention Karp; however, his grievance filed on the day of the incident states that Karp was present and failed to timely report the assault. (Doc. 170 Ex. A64; *see also* Doc. 170 Ex. A65 (appealing outcome of

---

[5] The only medical record from August 9, 2006, is a note which reads "D/C Trazadone." (Doc. 118 Ex. B18.) There is no record of a physical assessment, nor is there a record that he suffered an injury to his chest.

grievance).)

Karp denies witnessing the incident. (Doc. 158 at 20.) In his affidavit, he testified that he was in a different room where he heard, but did not see, Chavez "using demanding language and shouting for an extended period of time." (*Id.*)

## II.    Treatment of Back Pain

Chavez's history of back problems predates his incarceration. (Doc. 170 Exs. C70 & C84; Doc. 173 Exs. A1- A31.) In August 1990, Chavez fell down a flight of stairs while at work and injured his back. (Doc. 173 Ex. A1.) After his fall, he was treated by Emmet J. Thorpe, M.D., Philip Martinez, M.D., and Dale Zimmermann, D.O. (Doc. 173 A1-A3, A7 & A8.) Dr. Thorpe referred Chavez for x-rays and MRI scans and diagnosed him with a herniated disc at L5-S1, and Dr. Martinez recommended he undergo surgery. (Doc. 173 Exs. A1-A4, A8, A19-A23.) Chavez refused surgery and epidural injections, and he began physical therapy in January 1991 to manage his pain. (Doc. 173 Ex. A12, A13 & A24-A30.)

Chavez's earliest available prison medical records begin in 1996. (Doc. 173 Ex. D3.) Throughout the late 1990s, he was seen for his chronic back pain. (Doc. 173 Exs. D1- D8.) During 1997, he was given back exercises and referred for physical therapy, although there are no records of any physical therapy appointment from that year. (Doc. 173 Exs. D4, D5 & D9.)

In August 2001, CMS ordered physical therapy for Chavez (Doc. 173 Ex. D17), and it appeared to continue into December 2002 (Doc. 173 Ex. D30). Chavez occasionally reported to physicians in 2002 that the treatment helped reduce his pain. (Doc. 173 Exs. D32, D34 & D36.) Other times, he reported little to no improvement. (Doc. 173 Exs. D31, D37 & D42.) There are a number of records showing that Chavez regularly refused to go to his scheduled appointments (Doc. 173 Exs. D10, D14-D15, D21, D25, D28, D30, D33, D38-D40 & D43), in addition to one grievance

from Chavez claiming that no one was collecting him for his appointments (Doc. 173 Ex. D13). In January 2004, a CMS nurse wrote that Chavez was "very noncompliant," and that, "from working with the [patient] in the past, [I] do not feel PT is beneficial for this patient." (Doc. 173 Ex. D29.)

In May 2002, while at the Penitentiary of New Mexico, Chavez had an MRI of his back after an assault aggravated his old injury; the MRI revealed a herniated disc at L5-S1 and a disc protrusion at L4-5. (Doc. 170 Exs. C70 & C73.) Sandra Penn, M.D., a CMS physician, referred Chavez to Erich Marchand, M.D., a neurosurgeon in Santa Fe, for a consultative exam. (Doc. 170 Ex. C72.) On September 3, 2002, after reviewing the MRI and examining Chavez, Dr. Marchand recommended Chavez undergo surgery, opining that he "would not expect a likely long term benefit from non surgical [sic] procedures such as epidural steroid injection." (Doc. 170 Exs. C68, C70 & C71.) Pursuant to Dr. Marchand's instructions, Dr. Penn referred Chavez for a lumbar discectomy on September 6, 2002. (Doc. 173 Ex. B2.) The surgery was scheduled, but the night before the procedure, Chavez changed his mind and refused the operation. (Doc. 178 Ex. B1 & B6.) Dr. Penn noted in Chavez's file that "no further effort will be made to schedule surgery unless there is a significant neurological deficit appreciated." (Doc. 178 Ex. B1.)

In May 2003, Dr. Penn referred Chavez for another MRI because he began suffering from chronic upper back pain. (Doc. 173 Ex. B4.) However, he was released from prison on June 13, 2003, so it is unclear if the MRI was performed. (Doc. 173 Ex. B14.) In August 2003, he saw Heather Hansen, M.D., for his back pain. (Doc. 173 Ex. B10.) She refilled his Neurontin and Prozac prescriptions, referred him to the pain management clinic for narcotics, and referred him for physical therapy. (Doc. 173 Ex. B11.)

On October 9, 2003, Chavez was again incarcerated, this time at the Central New Mexico Corrections Facility, where CMS also provided health services. (Doc. 170 Exs. B161 & C16.) The

CMS intake form indicates Chavez's history of back problems and that he was taking medicine for the pain. (Doc. 170 Ex. B161.) Between October 2003 and January 2004, Chavez saw several CMS nurses and doctors for his back problems. He informed them that his 2002 MRI had revealed a herniated disc, and the doctors managed his pain with ibuprofen, Neurontin, Naprosyn, and MS Contin. (Doc. 170 Exs. B74-B77.) Chavez claims that, during these months, the doctors never obtained copies of Chavez's medical records, and they refused to review the copies that he provided because they were not verified. (Doc. 170 Ex. 1 at 3-4; Doc. 170 Ex. B74.)

In January 2004, a CMS doctor sent Chavez for another MRI. (Doc. 170 Ex. C67.) After receiving the results, a CMS doctor referred him to the University of New Mexico Pain Clinic. (Doc. 170 Ex. C16.) Marc Slonimski, M.D., reviewed the MRI and examined Chavez in May 2004. (Doc. 170 Ex. C74.) Dr. Slonimski reported that Chavez wanted to "hold off on interventional procedures at this time," and he prescribed Chavez methadone. (*Id.*) Shortly after the consultation, a CMS doctor reviewed Dr. Slonimski's treatment recommendations and confirmed that Chavez did not want surgery at that time. (Doc. 170 Ex. C14.) The doctor prescribed Vicodin and gave him information regarding steroid injection treatment. (*Id.*) Chavez decided not to undergo steroid injections but did request physical therapy. (Doc. 178 Ex. B17.)

In August 2005, Chavez was transferred to BCMDC. (Doc. 170 at 1; Doc. 170 Ex. B151.) From August 28, 2005, through November 24, 2005, and from December 24, 2005, through March 2008, Chavez remained at BCMDC and was under the care of CMS and Shannon. (Doc. 170 Ex. 1 at 1.) In October 2005, Chavez obtained his medical records and presented them to Shannon for review. (*Id.* at 5.) Shannon rejected the MRI results and recommendations for surgery as "too old," and he refused to increase Chavez's pain medication or refer him for surgery until another MRI was conducted. (*Id.*)

-7-

In April 2006, an assault by an inmate again re-aggravated Chavez's back pain. (Doc. 170 Ex. A71.) In a series of four grievances, he complained that the injury had caused a great deal of pain, and he specifically requested that he undergo an MRI to assess his medical condition. (Doc. 170 Exs. C61, C71, C72 & C75.) On January 8, 2007, a CMS nurse practitioner referred Chavez for an MRI of his lower back. (Doc. 118 Exs. B41-B43.) The MRI was cancelled and rescheduled two times before it was finally performed on March 26, 2007. (Doc. 118 Exs. B45, B49 & B51.)

The results of the MRI revealed degenerative loss of T2 disc signal intensity, loss of disc height at T10-11, L4-5, and L5-S1, and vacuum disc phenomenon at T10-11 and L5-S1. (Doc. 118 Ex. B51.) Chavez had a disc "protrusion" at the L4-5 and a bulge at the L5-S1, but there was no disc "herniation,"[6] significant spinal stenosis, or neural foraminal narrowing. (*Id.*) CMS staff reviewed the results of the MRI with Chavez, and Shannon requested a neurosurgery consult on May 14, 2007. (Doc. 118 Exs. B58 & B60.) During this time, Shannon reduced Chavez's Neurontin dosage. (Doc. 118 Ex. B71; Doc. 170 Ex. A34.) Chavez filed a grievance regarding the reduction and was informed that his physician was waiting on the advice of the neurologist for his medication management. (Doc. 170 Ex. A34.)

Chavez saw Nevra S. King, M.D., at the University of New Mexico Neurosurgery Clinic on June 6, 2007. (Doc. 118 Ex. B60.) Dr. King prescribed Chavez oxycodone and Flexeril and recommended surgery to correct his back problems. (*Id.*; Doc. 31 at 20; Doc. 170 Exs. C77 & C78.) During the appointment, Chavez agreed to the surgery, and in the months that followed, he attempted to discuss his surgery and medications with Shannon. (Doc. 170 Exs. B12, B13 & C77.)

---

[6] It is not clear what the difference is between a protruded disc and a herniated disc. According to *Stedman's Medical Dictionary*, they are the same thing. STEDMAN'S MEDICAL DICTIONARY 523-24 (27th ed. 2000).

He met with Dr. Padilla, another CMS physician, for a follow-up appointment on July 3, 2007. (Doc. 170 Ex. B11.) Dr. Padilla's treatment notes are brief and offer little information as to what was discussed. (*Id.*) Chavez filed a grievance regarding the visit, in which he claimed that Dr. Padilla was not familiar with his MRI or his visit with Dr. King and her recommendations. (Doc. 170 Ex. A38.)

Chavez filed additional grievances on July 24, 2007, complaining that his attempts to schedule his back surgery had been ignored and that his medications had still not been adjusted. (Doc. 170 Exs. A23 & A27.) In a reply to his grievances on September 21, 2007, a nurse wrote that since his surgery was "non-emergent," Chavez would have to wait until his sentence was completed for treatment, and that CMS did not have to follow the recommendations of other doctors. (*Id.*) Over the next few months, Chavez continued to request medical attention for his back (Doc. 118 Exs. B69 & B70) and file grievances regarding his need for surgery (Doc. 170 Exs. A7, A9, A10 & A16). CMS staff occasionally ignored his requests to see a doctor. (Doc. 118 Exs. B63-B65, B69 & B70.) In response to his grievances, they claimed the issue had been addressed (Doc. 170 Exs. A7, A10 & A16) and told him to "stop bugging" (Doc. 170 Ex. A9).

Around July 2007, Shannon began to taper off Chavez's Neurontin, placing him on Naprosyn instead. (Doc. 118 at 13; Doc. 118 Ex. B61; Doc. 170 Ex. 1 at 7; Doc. 170 Exs. A19 & A21.) CMS doctors never ordered Flexeril or Vicodin for Chavez. Instead, at all times from June 2007 until November 2007, he was on some combination of baclofen, Darvocet, Neurontin, and/or Naprosyn. (Doc. 118 Ex. B71.)

In March 2008, Chavez was transferred out of BCMDC. (Doc. 170 Ex. 1 at 8.) Chavez is currently still incarcerated but no longer under the care of Shannon. (Doc. 170 Ex. 1 at 12.) Allegedly, his present physician is barred by CMS from prescribing him any pain medication other

than ibuprofen; as a result, he claims that he suffers constantly from "excruciating pain." (*Id.*)[7]

## PROCEDURAL BACKGROUND

Chavez filed a complaint in state court on February 18, 2009,[8] pursuant to the New Mexico Torts Claims Act ("NMTCA") and 42 U.S.C. § 1983 alleging medical negligence and malpractice and violations of his constitutional rights. (Doc. 3 Ex. A; Doc. 36 at 3, 6.) The case was removed to federal court on December 28, 2009 (Doc. 3), and Chavez filed an amended complaint on January 21, 2010 (Doc. 31).

I ordered Defendants to file a *Martinez* report on July 6, 2011. (Doc. 106.) Defendants filed their first *Martinez* report and a motion for summary judgment on August 5, 2011. (Doc. 118.) Chavez moved for a supplemental report (Doc. 120), and I granted his motion (Doc. 156). Defendants filed a supplemental report on December 23, 2011, including an additional motion for summary judgment. (Doc. 158.) Chavez requested an extension of time to respond to the motion. (Doc. 165.) I granted the motion in part, ordering Chavez to respond by February 8, 2012. (Doc.

---

[7] There is some dispute as to the relevant time period for this lawsuit. Chavez's complaint begins by saying that "at all relevant times" he was incarcerated at BCMDC. (Doc. 31 at 1.) Defendants have interpreted this to mean that the relevant time period ends on November 2007. (Doc. 118 at 2; Doc. 173 at 6; Doc. 175 at 2.) However, Chavez left in November 2007, and then returned December 2007 and remained there until March 2008. Since this stay at BCMDC predates the filing of his complaint, I believe that the relevant period, for purposes of this case, ends in March 2008. However, Chavez remained under CMS care after this period, and in 2008 and 2011, he had additional surgical consultations. In 2008, Patricia Gando, M.D., recommended back surgery, but Chavez declined surgery at that time. (Doc. 170 Ex. C79.) In 2011, Michael Baten, M.D., opined Chavez's case was non-surgical, but Chavez alleges that his medical opinion was influenced by his friendship with Shannon. (Doc. 170 Ex. 1 at 10-11; Doc 170 Ex. C54.)

[8] Defendants mistakenly state that Chavez filed his action on May 21, 2009. (Doc. 118 at 1.) While Defendant's complaint is date stamped "May 21, 2009" (Doc. 3 Ex. A), I explained in an earlier Proposed Findings and Recommended Disposition that his state court documents show his action was first filed on February 18, 2009. (Doc. 36 at 3, 6.) Thus, I will use this date as the date he commenced this lawsuit.

166.)

A month after his response was due, Chavez filed a Motion for Enlargement of Time to File a Late Declaration in Opposition to CMS Defendants' *Martinez* Reports (Doc. 169), as well as his response brief, which included almost four hundred pages of exhibits (Doc. 170.) According to Chavez, he attempted to mail his declaration and supporting documents on February 8, 2012, but, due to the size of the envelope, the corrections facility never mailed it. (Doc. 169 at 1-2, 5.) When he learned the envelope had not been mailed, he re-sent his declaration along with the motion for an extension of time, and he contacted Defendants to alert them of the delay and his intent to respond to the motion for summary judgment. (*Id.* at 2.) After speaking with Chavez, Defendants filed a Notice of Briefing Complete. (Doc. 168; Doc. 169 at 2.)

I granted Chavez's motion for an enlargement of time (Doc. 171), and I have reviewed the contents of Chavez's response brief and exhibits. Defendants filed a reply and second notice of briefing complete on March 27, 2012. (Doc. 173; Doc. 174.)

## STANDARD OF REVIEW

The court should grant summary judgment only when the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The record and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *See Ricci*, 129 S. Ct. at 2677; *Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000).

For purposes of summary judgment, a prisoner's complaint is treated as an affidavit if it alleges facts based on his personal knowledge and has been sworn under penalty of perjury. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). A *Martinez* report is also treated as an affidavit. *Id.* A court cannot resolve material disputed factual issues by accepting a *Martinez* report's factual

findings when they are in conflict with pleadings or affidavits. *Id.* at 1109. However, conclusory allegations without specific supporting facts have no probative value and cannot create a genuine issue of fact. *See Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005); *Annett v. Univ. of Kan.,* 371 F.3d 1233, 1237 (10th Cir. 2004); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992). As is true with all affidavits, statements of mere belief must be disregarded. *Argo v. Blue Cross & Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

## DISCUSSION

Chavez brings this lawsuit pursuant to the New Mexico Tort Claims Act ("NMTCA") and § 1983, alleging eight claims: (1) failure of Karp and Kelly to intervene in a corrections officer's use of excessive force; (2) failure of Karp and Kelly to report assaults that they personally witnessed; (3) failure of Karp and Kelly to provide Chavez with immediate medical attention after witnessing the assaults; (4) failure to provide adequate pain medication, as ordered by his doctors; (5) failure to ensure that his medications were re-ordered before the prescription expired; (6) delays in medical appointments; (7) failure to provide physical therapy; and (8) failure to provide back surgery as recommended by his surgeon. (Doc. 31 at 10, 19-20; Doc. 170.)[9]

---

[9] Chavez lists seven causes of action in his complaint. (Doc. 31 at 20-27.) This list includes a number of claims against the County and City Defendants, which have since been dismissed. The eight claims that I will discuss come from a separate, itemized list, as well as facts alleged in the body of his pleadings. (*Id.* at 10, 19-20; Doc. 170 Ex. 1 at 15-16.) Additionally, Chavez alleges a ninth claim in his response brief that Defendants violated the terms of the December 28, 2004, Settlement Agreement in *McClendon v. City of Albuquerque*, No. 95-CV- 0024 MV/ACT, which was also heard in the District of New Mexico. (Doc. 170 Ex. 1 at 13-14.) Although I must liberally construe the pleadings of a *pro se* party, I cannot consider a new claim that is raised for the first time on summary judgment because it may result in prejudice to the opposing party. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (holding a court must liberally construe pleadings of pro se party); *see also Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005); *Evans v. McDonald's Corp.,* 936 F.2d 1087, 1090-91 (10th Cir. 1991); *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990) ("As the district court correctly noted, this claim was not raised in Fisher's second amended complaint but, rather, was raised in his response to the defendants'

Defendants argue that none of these claims have merit. With respect to his state law claims under the NMTCA, they argue that the statute of limitations has run, and, to the extent claims are not barred by the statute of limitations, he has not made a *prima facie* case for medical malpractice or negligence because he has not established the standard of care through expert testimony. (Doc. 118 at 15.) As to his § 1983 claims, Defendants assert that Chavez has failed to show that the acts or omissions of CMS and its doctors violate the Eighth Amendment. (*Id.* at 16; Doc. 158 at 4-11.)

## I.    State Law Claims

### A.    *Statute of Limitations*[10]

Individuals bringing a claim under the NMTCA must do so within two years of the date of the incident giving rise to the claim. N.M. STAT. ANN. § 41-4-15(A) (LexisNexis 2011). Chavez may only seek relief under the NMTCA for events that occurred on or after February 18, 2007. Accordingly, the statute of limitations has run on his first three claims, since they are based on assaults that occurred in 2006. Claims four through seven are general claims regarding the failure to provide care and services over time, so they are not barred to the extent that they involve incidents that transpired after February 18, 2007. Chavez's eighth claim is based on a medical decision made in June 2007, so it is not barred. (Doc. 118 Ex. B60; Doc. 170 Ex. C62.)[11]

_____

motion for summary judgment and, as such, was not properly before the court.").

[10] My Proposed Findings and Recommended Disposition filed May 19, 2010 (Doc. 36), as adopted in part as an order of the Court on August 20, 2010 (Doc. 44), discusses the statute of limitations and applicable tolling period in depth.

[11] The statute of limitations on his federal claims is three years, so the Court may consider all of his claims to the extent that they involve incidents occurring on or after February 18, 2006. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007) (holding the statute of limitations for a § 1983 claim is governed by law of the state in which the alleged violation occurred); *Hardin v. Straub*, 490 U.S. 536, 538 (1989) (same); *Wilson v. Garcia*, 471 U.S. 261, 265-66 (1985), *superseded in part by statute* (in a manner not relevant to § 1983 claims) (holding that in New Mexico § 1983 actions are

**B.      Absence of Expert Testimony**

Defendants argue that Chavez's medical malpractice claims "*must* be supported by expert medical testimony," and his failure to proffer an expert opinion entitles them to judgment as a matter of law. (Doc. 118 at 15 (citing *Pharmaseal Lab. v. Goffe*, 568 P.2d 589 (N.M. 1977)) (emphasis in original).) Defendants oversimplify the law on this matter. The Supreme Court of New Mexico held in *Pharmaseal* that:

> It is not mandatory in every case that negligence of the doctor be proved by expert testimony which shows a departure from reasonable standards of care. Negligence of a doctor in a procedure which is peculiarly within the knowledge of doctors, and in which a layman would be presumed to be uninformed, would demand medical testimony as to the standard of care. However, if negligence can be determined by resort to common knowledge ordinarily possessed by an average person, expert testimony as to standards of care is not essential.

568 P.2d at 594. Thus, the plaintiff does not need to provide expert testimony when there are "patent violations of the standard of care." *Gonzales v. N.M. Bd. of Chiropractic Exam'rs*, 962 P.2d 1253, 1258 (N.M. 1998).

Despite their oversimplification of the law, the practical application of *Pharamseal* is "that expert medical evidence is generally essential to establish the elements of 'departure from the proper standard of care' and 'causation' in medical malpractice actions." *Zuls v. United States*, 1995 U.S. App. LEXIS 16635, at *6 (10th Cir. July 7, 1995) (citations omitted) (unpublished). Situations in which laymen may determine the standard of care are rare and the standard is usually obvious. For example, in *Pharamseal*, a doctor forcefully removed an intestinal tube inserted into a patient's

---

characterized as personal injury actions and are subject to a three year statute of limitations, not the two year statute of limitations under the NMTCA). Additionally, I will consider all of the medical evidence dating back to 1990 for both the state and federal claims to the extent that they inform Defendants' subjective state of mind when making decisions about Chavez's medical care after May 2006.

nose, causing a balloon of mercury to break open inside the patient's body. 568 P.2d at 591-92. The doctor then instructed nurses to beat on the patient's back for hours in an attempt to drain the mercury for his lungs. *Id.* For more complex medical issues, such as the diagnosis of a medical condition or administration of medicine, the plaintiff must provide the opinion of an expert. *Zuls*, 1995 U.S. App. LEXIS 16635 at *6-7; *Woods v. Brumlop*, 377 P.2d 520, 522 (N.M. 1962).

Turning to Chavez's claims, I believe that expert testimony is necessary to establish the standard of care as to the prescription and administration of pain medication (claims four and five) or physical therapy (claim seven), the promptness and frequency of medical appointments (claim six), and the appropriateness of surgical intervention for an individual with back pain (claim eight). Chavez has not provided expert testimony or any medical opinions as to the proper standard of care with respect to claims four, five, six, and seven. However, the record contains medical treatment notes from a surgeon that clearly recommends that he undergo back surgery. (Doc. 170 Exs. C77-C80.) This opinion is supported by other surgeons. (Doc. 170 Exs. C70-C71; Doc. 173 Exs. A7-A8.) At the summary judgment stage, I believe the opinions of surgeons, as evinced by their treatment notes, satisfy the expert testimony requirement for a malpractice action and sufficiently create an issue of material fact as to whether Defendants breached the standard of care owed to Chavez by failing to provide surgery. Accordingly, I recommend the Court enter summary judgment in favor of Defendants as to claims four, five, six, and seven for the failure to provide expert testimony and deny judgment on claim eight.

## II. Federal Law Claims

Federal law provides individuals with a remedy for the deprivation of the "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See* 42 U.S.C. § 1983; *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). Since § 1983 is only a vehicle through which a

plaintiff may enforce these rights, I must turn to the underlying constitutional rights for the legal standard against which I will assess Defendants' conduct.

A.      *Failure to Intervene*

Chavez alleges that Kelly and Karp witnessed corrections officers using excessive force but failed to intervene on his behalf.[12] A correctional officer's use of excessive physical force against a prisoner may constitute cruel and unusual punishment in violation of the Eighth Amendment. *Wilkins v. Gaddy*, --- U.S. ---, 130 S. Ct. 1175, 1177 (2010). To be liable for excessive force, the defendant must be personally involved in the alleged constitutional violation. *Foote v. Spiegle*, 118 F.3d 1416, 1423 (10th Cir. 1997). Courts interpret the meaning of "involvement" broadly. In the Tenth Circuit, "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008); *see also Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996).

However, it is unclear if the affirmative duty to intervene would extend equally to mental health professionals working in a correctional facility. The plain language of our jurisprudence states that a law enforcement officer has a duty to intervene, and neither Kelly nor Karp are law enforcement officers. Further, the Tenth Circuit is silent as to whether non-law enforcement officers may ever be liable for the excessive force of a law enforcement officer.

---

[12] Chavez did not discuss intervention in his complaint when he listed his allegations against Defendants. (Doc. 31 at 19-20.) However, when describing the incident with Officer Sanchez he claims, "Dr. Robert Karp witnessed and did nothing to stop Sanchez from continuing to threaten and place Plaintiff's life in danger." (Doc. 31 at 10.) Furthermore, his response brief clearly states a cause of action against both Kelly and Karp for failing to intervene. (Doc. 170 Ex. 1 at 13, 15, 16.) Because I must liberally construe the pleadings, I have construed this as an excessive force claim against Kelly and Karp.

The Supreme Court held that the state's duty to protect inmates from abuse "arises not from the [s]tate's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) (citations omitted). At first blush, *DeShaney's* use of "the state" seems to extend the responsibility to intervene to all state actors. Yet, the emphasis on due process focuses the application of the duty to intervene. The Court explains that, by incarcerating or committing an individual, the state severely limits and even extinguishes the ability of an individual to protect himself or flee. *Id.* Stripping the incarcerated individual of both fight or flight options is to take away his liberty; thus, the failure to protect that individual is a violation of due process. *Id.*

The requirement that a police or corrections officer intervene upon witnessing a fellow officer violate the constitutional rights of an individual clearly fits within this due process framework. After all, an officer has both the authority and a duty to "enforce the laws and preserve the peace." *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). Thus, the key is not that the law enforcement officer is a state actor; it is that he is connected to the restraint on liberty and shares the same duties and privileges as the officer personally involved in the constitutional violation.

However, a non law enforcement officer does not necessarily have the same degree of authority to restrain an individual's liberty. Two other circuits have extended the duty to intervene to non law-enforcement officers, but in each case, the witnesses had some degree of authority over the Plaintiff and the situation. The First Circuit, in dicta,[13] considered the duty of a nurse and a

---

[13] The crux of the legal inquiry in *Davis* was whether the jury instruction on the failure to intervene claim was correct, not whether the mental health workers could be liable for failure to intervene. 264 F.3d at 96, 98.

mental health worker ("MHW") to intervene in the assault of a mental patient committed to a state hospital. *Davis v. Rennie*, 264 F.3d 86, 92, 96 (1st Cir. 2001). Davis left the hospital without permission, and, when he was brought back, he was intoxicated. *Id.* at 92. The head nurse instructed several MHWs to restrain Davis; during the process, one of the MHWs punched him in the head four or five times in front of the other MHWs and the nurse. *Id.* at 92-93, 94.

The court accepted that the MHWs and the nurse had a duty to intervene and could be liable for excessive force. *Id.* at 97-98. Speaking of the duty in broad terms, the court explained that the "state has a duty to protect incarcerated prisoners and involuntarily committed mental parties from harm by a state actor." *Id.* at 98 (citing *DeShaney*, 489 U.S. at 199). In support of this proposition, the court relied on a case holding that a law enforcement officer has a duty to intervene when another officer uses excessive force. *Id.* at 98 n.9. However, the court did not explain why the officer's duty to intervene applied equally to the MHWs and nurse.

A review of the facts reveals the similarities between the defendants in *Davis* and law enforcement officers. First, the MHWs in *Davis* had a security function: restraining violent patients was clearly one of their duties. Like a law enforcement officer, an MHW's authority to restrain liberty was coupled with a duty to ensure such authority was not abused. The head nurse also shared in this authority, since she was responsible for the care of the patient and the overall safety of that particular hospital ward. She had also instigated the use of force, directing the MHWs to restrain Davis. It logically flows that she would be liable for the use of force carried out under her orders and in her presence.

The Sixth Circuit articulated this same notion of responsibility in *Durham v. Nu'Man*. 97 F.3d 862 (6th Cir. 1996). The government committed Durham to a state mental hospital because he was incompetent to stand trial. *Id.* at 864. Durham asked the nurse if he could use the restroom. *Id.*

The nurse had an arbitrary policy in which patients could use the restroom during one fifteen minute period every hour, and since Durham's request came outside one of that allotted period, she refused to take him. *Id.* Durham urinated on himself, and, when he refused to clean up the urine, the nurse called for the security guards to punish him. *Id.* at 865. The patient was subsequently beaten by the guards in front of the nurse. *Id.* The Sixth Circuit held that the nurse was liable for failing to protect the patient, emphasizing the fact that the nurse had "caused the conflict." *Id.* at 868. As the cause of the conflict, she was responsible for the restraint in liberty: she denied the patient access to the restroom, she called the security officers, and she directed the officers to punish Durham.

Taken together, *DeShaney*, *Davis*, and *Durham* illuminate the nature and type of the relationship between the victim of excessive force and witnesses to the use of force that is necessary to substantiate liability under the duty to intervene. The core concept is whether the state actor watching, whether law enforcement personnel or not, is involved in the deprivation of liberty. In a state mental hospital, the health care providers have an immediate and obvious responsibility over the patients, and they have a far greater degree of control. As is illustrated in *Davis* and *Durham*, the nurses had the ability and authority to direct the use of force against patients and they used it.

In a correctional facility, though, the link between a health care provider and a inmate is more attenuated. In the case at bar, neither Kelly nor Karp directed the use of force against Chavez.[14] In fact, neither psychiatrist interacted with Chavez before or during the assaults; rather, they were merely in the vicinity of his cell when they occurred. Furthermore, a psychiatrist in a prison does not have the same degree of overall responsibility for a patient in the way that a nurse in a mental

---

[14] At this point, I am not evaluating whether Chavez has alleged facts supporting a claim that either incident rises to the level of excessive force. Rather, the focus of this analysis is only on the duty to intervene.

hospital has over a patient. While both were responsible for Chavez's mental health care, they did not control or oversee the conditions of his confinement or even his day-to-day care. The core due process concern was not present in the same way, since neither were involved in the depravation of his liberty. Therefore, Kelly and Karp did not have a duty to intervene in either incident, and they cannot be liable for the use of excessive force.

B.    *Failure to Report Excessive Force*

In addition to alleging that Kelly and Karp had a duty to intervene, Chavez asserts that they had a duty to report incidents of excessive force by correctional officers. A defendant's failure to report incidents of excessive force may constitute a violation of an inmate's Eighth Amendment rights if he or she acted with deliberate indifference in disregarding a known or obvious risk to safety. *Berry v. Muskogee*, 900 F.2d 1489, 1498 (10th Cir. 1990); *Fuller v. Wooten*, 1995 U.S. App. LEXIS 25707, at *4 (10th Cir. Sept. 11, 1995) (unpublished). To establish that Kelly and Karp acted with deliberate indifference to his safety in failing to report either incident, Chavez must show that: (1) they had actual knowledge of the specific risk of harm to Chavez or that the risk was so substantial or pervasive that knowledge can be inferred; (2) they failed to take reasonable measures to avert the harm; and (3) their failure to take such measures in light of their knowledge justifies liability for the consequences of the incident. *Berry*, 900 F.2d at 1498. (citations omitted).

In the first incident, Kelly witnessed Officer Howell intentionally "smash" Chavez's hands in a food port but never reported the incident. (Doc. 31 at 8; Doc. 170 Ex. 1 at 15-16.) As a result of Howell's actions, Chavez was in "excruciating pain" and suffered bruising, swelling, abrasions, and lacerations, although there were no broken bones. (Doc. 31 at 8; Doc. 118 Ex. B17.) Since the unnecessary infliction of pain alone may violate the Eighth Amendment, I believe there is a genuine issue of material fact that Chavez did suffer serious harm. *See Mitchell v. Maynard*, 80 F.3d 1433,

1444 (10th Cir. 1996). However, the whole incident happened quickly. Even if Kelly had realized the extent of the harm, there are no facts to suggest that she could have averted the harm. First, there is no reason to believe that she knew of or should have foreseen Howell's plan to harm Chavez. Second, the incident was over in less than a minute, so reporting it would not have caused it to terminate sooner. Third, Chavez does not allege that there were additional incidents of assault with the food port afterwards, so reporting the incident would not have averted future harm.

The second incident occurred only weeks later. Chavez claims that Karp witnessed Officer Sanchez assault him in his cell. (Doc. 31 at 10; Doc. 170 Ex. 1 at 18-19.) Karp denies witnessing the incident (Doc. 158 at 21-22), but because Chavez's statements in his complaint are to be treated as an affidavit, I believe he has created a genuine issue of material fact as to whether Karp witnessed the incident. Nonetheless, the facts do not support any finding that there was any serious risk of harm to Chavez. According to Chavez's version of events, Sanchez punched him once, threatened him for several minutes, and then left. (Doc. 31 at 10.) First, verbal threats or harassment do not rise to the level of a constitutional violation unless they create "terror of instant and unexpected death." *Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992). While Chavez claims that Sanchez "[placed] his life in danger," this allegation is conclusory. (Doc. 31 at 10.) There is no evidence that the threats themselves could have actually created a genuine sense of terror. Further, a single punch to the chest does not rise to the level of serious harm or even pain. Thus, Karp did not violate Chavez's constitutional rights in declining to report the incident.

Alternatively, Chavez claims that BCMDC's policies and guidelines mandate that all staff, including contracted medical personnel, must immediately notify a supervisor of the assault and submit a report at the end of the shift. (Doc. 170 Ex. 1 at 14-15.) Correctional facility standards and policies do not establish constitutional parameters for what action is deemed "reasonable," but they

-21-

are persuasive authority. *Lopez v. LeMaster*, 172 F.3d 756, 761 (10th Cir. 1999). For our purposes, the existence of a reporting policy and the failure to follow that policy cannot establish a constitutional violation in a § 1983 action, but it does inform the Court's analysis of the reasonableness of Kelly's and Karp's actions. Having already found that reporting would not have averted any risk of harm in the first incident and Chavez was not seriously harmed in the second, I do not need to address Kelly's and Karp's reasonableness in light of this policy.

C.      *Failure to Provide Medical Care*

The government has an obligation to provide medical care to inmates in its custody. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The failure to provide medical care is a violation of the Eighth Amendment when the government acts with "deliberate indifference to serious medical needs." *Id.* at 104; *see also Berry*, 900 F.2d at 1494 n.6 ("[T]he Eighth Amendment is the primary source of substantive rights of prisoners . . . .").

The test for constitutionally deficient medical care has both objective and subjective components. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The objective component requires that the deprivation or medical need be "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005). Pain alone may be sufficiently serious to constitute a serious medical need. *See Mitchell v. Maynard*, 80 F.3d 1433 (10th Cir. 1996); *see also Franklin v. Kan. Dep't of Corr.*, 160 F. App'x 730, 735 (10th Cir. 2005) (unpublished). When a prisoner complains about an interruption or absence of medical treatment, the focus is on whether the interruption caused the prisoner substantial harm, such as a "lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254

-22-

F.3d 946, 950 (10th Cir. 2001).

The subjective component concerns whether the defendant knew of and disregarded an excessive risk to the inmate's health or safety. *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006); *see also Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). Prison medical professionals who serve as gatekeepers for other medical personnel may be held liable under the deliberate indifference standard if they delay or refuse to fulfill that gatekeeper role. *Mata*, 427 F.3d at 751; *see also Estelle*, 429 U.S. at 104-05. However, "the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment. Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 131 (2006). Ordinarily, deciding whether to order tests is a matter for medical judgment and the failure to order tests is not cruel and unusual punishment. *Estelle*, 429 U.S. at 107; *El'Amin v. Pearce*, 750 F.2d 829, 832-33 (10th Cir. 1984).

Chavez brings six claims that fall under the umbrella of the Eighth Amendment requirement for adequate medical care. (Doc. 31 at 19-20.) In order to avoid summary judgment on these claims, Chavez must set forth facts demonstrating that his medical need was objectively sufficiently serious or that Defendants' delay in meeting that need caused him substantial harm, and that Defendants' knew of the severity of his condition but disregarded it. I find that he has failed to establish a genuine issue of material fact as to the existence of the objective prong, subjective prong, or both prongs on all but two of his claims.

1.    Failure to Provide Immediate Medical Care after an Assault

Returning to the two assaults witnessed by Kelly and Karp, I believe that there is only a genuine issue of material fact as to whether Kelly acted with deliberate indifference in failing to

provide Chavez with immediate medical care. As previously noted, Chavez has satisfied the objective prong by alleging facts to show that he sustained a sufficiently serious injury. Additionally, he has shown sufficient facts to indicate that Kelly had actual knowledge of his pain. Kelly was allegedly five feet away from the food port when it was closed on Chavez's hands and caused cuts, bruising and swelling. The incident lasted thirty to forty seconds, during which time Chavez screamed in pain.[15] (Doc. 170 Ex. 1 at 16.) Although Kelly's affidavit indicates that she was unaware of the extent of his pain at the time (Doc. 158 at 14), I believe there are facts to support a contrary finding. Accordingly, I cannot recommend that the Court grant summary judgment for Kelly on this claim.

However, I will recommend summary judgment for Karp on this claim. As noted above, the only real harm the Chavez was that he sustained a single punch or shove to the chest. I do not believe that injury is sufficiently serious. This conclusion is reinforced by the absence of any notation in his voluminous medical records that the punch harmed him in any way. Chavez has not met the objective component of the deliberate indifference test.

2.    <u>Failure to Provide Adequate Pain Medication</u>

Chavez claims that Defendants failed to provide him adequate pain medicine for his back condition. (Doc. 31 at 19.) The record clearly indicates that Chavez was not denied pain medication for his back problems from 2002 until January 2010. While Shannon and various CMS physicians chose not to provide him with narcotic pain medications such as oxycodone and hydrocodone at various points during that period, Chavez's doctors did provide him with alternative medications

---

[15] Chavez also alleged that Kelly had a duty to provide immediate medical attention per BCMDC policy guidelines. (Doc. 31 at 9; Doc 170 Ex. 1 at 13-14.) While I believe that Chavez has created a genuine issue of material fact without the aid of these guidelines, their existence makes Kelly's failure to provide immediate medical attention even more unreasonable.

such as Neurontin, baclofen, Darvocet, and Naprosyn. Since Defendants did not withhold care during this period, Chavez is essentially challenging their medical judgment as to the type and amount of pain medicine prescribed. Chavez's disagreement with the medical judgment of Defendants is not a basis for an Eighth Amendment violation. *See generally Self*, 439 F.3d at 1232.

3.    Failure to Re-order Medication

Chavez claims that his medications were not timely re-ordered. (Doc. 31 at 19-20.) However, he has failed to show that the alleged gaps in his access to medicine resulted in serious medical harm. *See Garrett*, 254 F.3d at 950. Patrick Arnold, M.D., reviewed Chavez's medical records and opined that "there were no medically significant lapses in plaintiff receiving his medication." (Doc. 158 at 39.) Since Chavez has not created an issue of fact as to whether gaps in his drug regime led to serious harm, he has not established facts to support the objective prong.

4.    Delays in Appointments

Chavez frequently requested counseling for his mental health issues and medical attention for his back pain. (Doc. 31 at 20, 25-26; Doc. 170 Ex. 1 at 1, 5-6, 8, 12.) His claim regarding mental health care is generalized, and he fails to point to a specific incident in which a delay in receiving counseling caused significant harm. Thus, he has not met the objective prong, and this claim cannot survive summary judgment.

With respect to his medical claims, there was a significant delay between the time he requested an MRI and a surgical consult for his back in 2006 and the time he was seen by Dr. King in 2007. However, Dr. King's notes do not indicate that the delay resulted in any serious injury, handicap, or that it irreparably impacted his ability to recover, and Chavez does not allege facts to support such a conclusion.

### 5. Failure to Provide Physical Therapy

Chavez argues he was denied physical therapy for his back pain. (Doc. 31 at 20.) In 2008, Dr. Gando recommended that Chavez undergo physical therapy. (Doc. 170 Ex. C62.) CMS refused to approve the treatment. (Doc. 170 Ex. 1 at 9.) Defendants argue that this recommendation for physical therapy is not within the "relevant time period," and I agree. (Doc. 173 at 6.) Thus, Chavez's claim is based on a personal opinion that he should have received physical therapy while at BCMDC. Such belief is not actionable for two reasons. Chavez's belief that he needs a form of treatment, without more, is not enough to establish a constitutional violation. *See Hackler v. Wackenhut Corr. Facility*, 95 F. App'x 293, 295 (10th Cir. 2004) (unpublished). Additionally, physicians are free to exercise their medical judgment as to the appropriate treatment for a patient. *See Self*, 439 F.3d at 1232. The decision to manage Chavez's pain through medications and not physical therapy is not the basis for a constitutional violation.

### 6. Failure to Provide Back Surgery

Chavez's final claim is that CMS and Shannon denied him back surgery in 2007. Chavez's complaint states that Dr. King recommended that he have back surgery in June 2007 (Doc. 31 at 20), and that the failure to provide surgery has resulted in severe upper and lower back pain, left leg pain, and difficulty walking, sitting and sleeping (*id.* at 19). Additionally, in 1990 and 2002, two other physicians recommended surgical intervention as a means to correct his pain. These three recommendations coupled with his uncontradicted allegations of pain and difficulty moving create a genuine issue of material fact as to whether Chavez had a sufficiently serious condition in 2007 under the first prong.

The second prong is more challenging, but, viewing the facts in the light most favorable to Chavez, I believe that he has met his burden. First, in 2007, when Shannon and CMS denied Chavez

-26-

surgery, they were well aware of his history of back problems, the three prior medical opinions recommending surgery, and his MRIs, which evinced herniated discs and degenerative disc disease. In addition to his medical records, Chavez continually lobbied for surgery in 2007. (*See* Doc. 170 Exs. A7, A9, A10, A16, A23 & A27.) This knowledge and their refusal to take action creates a genuine issue of fact at the subjective prong.[16]

Defendants argue that Chavez's refusal to undergo surgery in 2002 and 2008 make him the sole cause of his injury and render Defendants' action proper. To their first point, his refusal to undergo surgery five years prior cannot eliminate a finding that they acted with deliberate indifference in 2007. Chavez's 2007 MRI reveals that his injury worsened over time, making it understandable why his desire and need for surgery would increase. He has created a genuine issue of fact, and his prior actions cannot undermine that.

As to his refusal in 2008, this is irrelevant for the sole purpose of a constitutional inquiry regarding Shannon and CMS's actions in 2007. Shannon and CMS could not have known in 2007 that Chavez would later refuse treatment in 2008. While this fact may be important in assessing

---

[16] I do not believe that the denial of back surgery is a matter of medical judgment, as was the denial of physical therapy. First, none of Chavez's physicians recommended physical therapy in 2007, but Dr. King had recommended surgery. Second, physical therapy and surgery serve different functions and address separate medical issues. Chavez's back problems present two separate issues-his chronic pain, and the underlying medical source of the pain. The treatment notes suggest that physical therapy would have been a method of pain management, but that surgery would be corrective and served as a "cure" for Chavez's condition. In fact, it appears as if surgery may have been the only long-term solution to his condition. (Doc. 170 Ex. C70 ("I would not expect a likely long term benefit from nonsurgical procedures"); Doc. 173 Exs. A7 ("[Chavez] is going to require corrective surgery"), A8 ("I've advised the patient, as has Dr. Martinez, that he needs to have surgery. I'm afraid that he might develop some irreversible weakness/paralysis of his right ankle/foot"), & A9 ("modality treatments . . . might be of *temporary benefit* to him")). If surgery is the only possible solution for Chavez's problem, then the decision not to provide surgery is not merely an exercise of judgment, but it is effectually a decision not to treat the patient's problem at all. In essence, CMS and Shannon were "gatekeepers" for Chavez's surgery, and Chavez has shown facts that, in 2007, they refused to fill that role. *See Mata*, 427 F.3d at 751.

Chavez's ability to mitigate damages, that is not the question before me today. I must only consider whether there is a genuine issue of fact as to whether Shannon and CMS violated the Eighth Amendment in 2007 when they denied Chavez access to his surgery. I believe there is.

Lastly, I turn to Defendants' assertion that Chavez failed to "produce any documentation that he requested surgery, let alone that Defendants refused such a request." (Doc. 173 at 4.) This statement demonstrates a fundamental misunderstanding of how a § 1983 prisoner lawsuit works. His pleadings and response are construed as affidavits, *see Hall*, 935 F.2d at 1111, so his statements that Defendants "[refused] to ensure that Plaintiff [received] back surgery as recommended by his back surgeon" (Doc. 31 at 20), "the CMS Defendants, including Doctor Shannon, refused to follow any order written by my neurologist including her orders for medication and surgery" (Doc. 170 Ex. 1 at 7), and "I submitted another grievance requesting assistance with information on what to do about my back surgery . . ." (*id.* at 8) support his allegations that he requested surgery and this request was refused. Moreover, Chavez did provide supporting documentation for his allegations. Dr. King's treatment notes state "[t]he patient wants to have surgery" (Doc. 170 Ex. C77), Chavez provided copies of grievances in which he asked about having surgery (Doc. 170 Exs. A10, A11, A15, A16 & A23),[17] and one response denies his surgery because it was deemed "non-emergent" (Doc. 170 Ex. A23). Defendants, not Chavez, were responsible for providing said documents but they failed to do so, twice. To now argue that Chavez is at fault for not providing proper documentation, after I have already issued an order to show cause why I should not sanction

---

[17] Defendants seem to argue that Chavez's grievance should have explicitly asked for surgery. Writing "I have repeatedly talked to medical nurses . . . about seeing a doctor in order to find out what I need to do to prepare for my surgery . . ." seems like a clear indication that Chavez wanted and expected to have surgery. (Doc. 170 Ex. A11.)

Defendants for this failure, is baffling.[18]

## CONCLUSION

Chavez raises eight claims under both state and federal law. The statute of limitations combined with the requirement that Chavez provide expert testimony to establish the standard of care in a medical malpractice suit bars him from bringing seven of his eight state law claims. There is a genuine issue of fact as to whether Defendants committed medical malpractice by denying him back surgery. Of his federal claims, he has failed to show that there is a genuine issue of fact that the Defendants committed constitutional violations as to six of his claims. There is a genuine issue of fact as to whether Kelly's failure to provide Chavez with immediate medical attention after the food port incident and CMS's and Shannon's failure to provide him with back surgery amount to deliberate indifference. Therefore, I recommend that the Court grant in part and deny in part Defendants' motion for summary judgment, and enter judgment as follows:

(1) for Defendants on state law claims one, two, three, four, five, six, and seven;

(2) for Defendants on federal claims one, two, four, five, six, and seven; and,

(3) for Karp on federal claim three.

I also recommend that the Court dismiss Defendant Karp with prejudice because Chavez has not alleged facts demonstrating his involvement with the remaining claims.

---

[18] On March 29, 2012, Defendants filed their response to the order to show cause. (Doc. 175.) Their response failed to acknowledge the extent of their deficient document production; however, since Defendants' have new counsel, and their prior counsel was responsible for compiling the previous *Martinez* reports, I will not sanction Defendants at this time.

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

William P. Lynch
United States Magistrate Judge